IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Kristopher Allard Reichardt, ) | Civil Action No. 6:11-3254-DCN-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Michael J. Astrue, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

In August of 2003, the plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits alleging disability beginning on January 12, 1989. The plaintiff did not meet the insured status requirements for DIB and was therefore not eligible for benefits. The SSI claim was denied at the initial level on December 19, 2003. The plaintiff did not file an appeal.

---

[1]A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

On July 15, 2008, the plaintiff filed an application for child's insurance benefits[2] based on disability (based on wage earner Frederick R. Reichardt's record). The plaintiff also filed an application for SSI on July 7, 2008. In both applications, the plaintiff alleged disability beginning August 1, 2004. The applications were denied initially and on reconsideration by the Social Security Administration. On July 1, 2010, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff appeared[3] on April 28, 2011, considered the case *de novo*, and on June 16, 2011, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council declined review on October 4, 2011. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1)     Born on August 8, 1984, the claimant had not attained age 22 as of August 1, 2004, the alleged onset date (20 C.F.R. §§ 404.102, 416.120(c)(4) and 404.350(a)(5)).
>
> (2)     The claimant has not engaged in substantial gainful activity since August 1, 2004, the alleged onset date (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> (3)     The claimant has had the following severe impairments: attention deficit hyperactivity disorder (ADHD), and depression (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

---

[2]In order to be entitled to child's insurance benefits, the claimant must have a disability that began before reaching age 22. *See* 20 C.F.R. § 404.350(a)(5). In this case, the plaintiff was born in August 1984, and, therefore, he had not reached the age of 22 by his August 1, 2004, alleged onset date (Tr. 27).

[3]The ALJ also obtained vocational expert testimony in the form of interrogatory responses from Robert E. Brabham, Jr., an impartial vocational expert (Tr. 246-50).

(4)    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).

(5)    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations:  limitation to unskilled non-production type work with minimal contact with co-workers or public.

(6)    At all times relevant to this decision, the claimant has been unable to perform any past relevant work (20 C.F.R. §§ 404.1565 and 416.965).

(7)    The claimant was born on August 8, 1984, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 C.F.R. §§ 404.1563 and  416.963).

(8)    The claimant has a limited education and is able to communicate in English (20 C.F.R. §§ 404.1564 and 416.964).

(9)    Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 C.F.R. Part 404, Subpart P, Appendix 2).

(10)    Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 C.F.R. §§ 404.1569,  404.1569(a), 416.969 and 416.969(a)).

(11)    The claimant has not been under a disability, as defined in the Social Security Act, from August 1, 2004, through the date of this decision (20 C.F.R. §§ 404.350(a)(5), 404.1520(g), and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

"Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions.  An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment.  20 C.F.R. §§ 404.1520[4], 416.920.  If an individual is found not disabled at any step, further inquiry is unnecessary.  *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial

---

[4]The regulations provide that the five-step sequential evaluation process applies to persons who file an application for child's insurance benefits based on disability.  20 C.F.R. § 404.1520(a)(2).  As noted above, in order to be entitled to child's insurance benefits, the claimant must have a disability that began before reaching age 22. *See id.* § 404.350(a)(5).

4

evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that his conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

The plaintiff was 19 years old on his alleged disability onset date (August 1, 2004) and 26 years old on the date of the ALJ's decision (Tr. 27, 33). He completed 12th grade and earned a certificate of completion rather than a diploma (Tr. 40).

The relevant medical evidence shows that from 2008 through 2010, the plaintiff saw therapist Harry Douglas, M.S., sporadically. Upon intake in August 2008, Mr. Douglas diagnosed the plaintiff with attention deficit hyperactivity disorder ("ADHD"), bipolar disorder, and rule out impulse control disorder (meaning that the plaintiff may or may not have that diagnosis and that further evaluation was needed) (Tr. 516-19). Two months later, Mr. Douglas completed a "discharge summary" form, in which he stated that the

5

plaintiff continued to use marijuana and was non-compliant with showing up for his appointments (Tr. 512). In August 2010, the plaintiff returned to Mr. Douglas. The plaintiff reported that he was "doing okay," that he was compliant with his medication (Adderall), and was working with vocational rehabilitation. The plaintiff denied problems with depression, anxiety, or irritable mood, and reported that he slept well at night, but also told Mr. Douglas that he continued to "party" with his friends on the weekend. A mental status exam showed normal findings except that the plaintiff was fidgety and showed only fair judgment and insight due to his immaturity (Tr. 520-23).

In December 2010, Mr. Douglas completed a "progress summary" in which he stated that the plaintiff had not presented for therapy recently and had stopped taking his medications because he claimed he could not afford them, but that the plaintiff was drinking heavily and exhibiting aggressive and hostile behavior (Tr. 524). On January 14, 2011, Mr. Douglas noted that the plaintiff's grandmother reported that he was "constantly hollering" and "making disparaging remarks" toward his grandparents who had raised him. Mr. Douglas stated:

> I have encouraged grandmother to put him out in that he is a grown man but she continues to enable him with funds and a place to live. . . . [The plaintiff] is spoiled, impulsive, entitled and generally immature. . . . [H]e denies any drug use but his honesty is questionable. . . . [W]ith the exception of mild agitation, [the plaintiff's] mental status is within normal limits.

(Tr. 511).

On January 20, 2011, the plaintiff saw Mr. Douglas for individual therapy. Mr. Douglas noted that the plaintiff and his "lady friend" had reconciled after a fight and that the plaintiff was still not working but was trying to get on disability (Tr. 510). Two months later, Mr. Douglas stated in a progress summary that the plaintiff was "making little progress," was not working, and that he was "not impressed that [the plaintiff] is trying very hard to find a job in that he knows his grandmother will enable him. Mr. Douglas added, "[H]e missed

several appointments but managed to get his lawyer to send for information about him getting on disability. I do not feel he will qualify for this program" (Tr. 513).

      In addition to his therapy with Mr. Douglas, the plaintiff went to the South Carolina Department of Mental Health for psychiatric outpatient care in March 2010. The plaintiff reported on intake that he had just been released from jail after serving over 100 days on charges of murder, armed robbery, and conspiracy to purchase marijuana (the murder and armed robbery charges were later dropped). The plaintiff also reported that he had a "significant problem with marijuana" in the past. A mental status exam showed entirely normal findings except for suicidal thoughts he had experienced in the past (Tr. 328-33). His diagnosis was ADHD by history; rule out bipolar disorder. His needs were to remain drug free and get into counseling (Tr. 332). The plaintiff followed up with a "Dr. Baxley" (whose credentials are not contained in the record) in March and April 2010 and reported that he was feeling "real good" and able to focus much better on Adderall and Desyrel (a sleep aid). Dr. Baxley noted that the plaintiff's ADHD was "under good control" and he was getting "good sleep"; Dr. Baxley recommended that the plaintiff continue his medications (Tr. 338-41). In July 2010, Dr. Baxley noted that the plaintiff was "doing great on current medications" (Tr. 509).

      In addition to the plaintiff's mental health treatment outlined above, a psychological evaluation of in connection with his disability application was performed in December 2008 by John Bradley, Ph.D. The plaintiff reported that his mother killed his father when he was eight weeks old, and his grandparents had raised him. He also reported that he attended school for 12 years but received a certificate of attendance rather than a diploma. He was in special education classes. The plaintiff told Dr. Bradley that he no longer took medication for ADHD. Dr. Bradley examined the plaintiff and found that he was cooperative but inarticulate; was easily frustrated; was alert and oriented; had a blunted affect and depressed mood; had below normal concentration and attention; and had limited

judgment and insight.  Dr. Bradley stated that testing showed the plaintiff functioned at a below normal level of intelligence with a full scale IQ of 74.  The plaintiff's reading and mathematics abilities were at a fifth grade level.  Dr. Bradley diagnosed depressive disorder, ADHD, intermitted explosive disorder, and borderline intellectual functioning.  He concluded that the plaintiff was able to understand and follow simple directions (Tr. 299-303).

In July 2009, state agency psychologist Judith Von, Ph.D., reviewed the plaintiff's medical records in connection with his disability application.  Based on her review, Dr. Von diagnosed the plaintiff with ADHD, depression, borderline intellectual functioning, and intermittent explosive disorder.  Dr. Von concluded that the plaintiff did not meet any mental listings (Tr. 307-19).  Dr. Von also completed an opinion regarding the plaintiff's ability to perform work-related activities in which she opined in Part I of the form that he was not significantly limited in 16 areas of functioning and was moderately limited in the other four areas.  She concluded in Part III of the form that the plaintiff could understand and carry out short, simple job instructions; sustain attention/concentration for at least two hour periods;  respond  appropriately  to  supervision  but  would  probably  work  best  in  an environment that did not require frequent exposure to the general public; that he may function best in a more solitary type work environment, but he could work in the presence of others; and that he could complete a normal workweek without frequent interruptions (Tr. 321-23).

In June 2010, state agency psychologist Michael Neboschick, Ph.D., also reviewed the plaintiff's medical records in connection with his disability application.  Dr. Neboschick agreed with Dr. Von's opinion that the plaintiff did not meet the mental listings (Tr. 346-58).  Dr. Neboschick largely agreed with Dr. Von's opinion regarding the plaintiff's ability to perform work related activities, but assessed in Part I of the form that the plaintiff had "moderate" limitations in five areas of functioning (as opposed to four) and was not

significantly limited in the other 15 areas. Similar to Dr. Von, Dr. Neboschick concluded in Part III of the form that the plaintiff had difficulty understanding, remembering, and carrying out detailed instructions but was capable of performing simple repetitive tasks for two hour periods without special supervision; would occasionally miss a day of work secondary to symptoms; would likely have difficulty working in close proximity or coordination with co-workers and was best suited for jobs that did not require continuous interaction with general public; and could attend work regularly and accept supervisory feedback (Tr. 360-62).

At the April 2011 administrative hearing, the plaintiff testified that he lived with his grandparents who supported him (Tr. 41). He said he had never held a job longer than a month and that he had quit all of his "10 or 11" jobs because he got frustrated with other people, could not concentrate, could not stay focused, and became angry (Tr. 42-43, 47-48, 62-63). The plaintiff testified that he had participated in vocational rehabilitation in the past, which he felt had helped him, but that he quit because he "couldn't be around all the people" and it was "too much overwhelming" (Tr. 44-45, 62). He said that all of the legal charges against him had been dismissed (Tr. 62).

The plaintiff testified that he drove a few times a week (Tr. 42, 58), helped his grandparents with chores around the house, watched television and read magazines (Tr. 53). He stated that he had a "bad knee," and he had surgery on it about ten years ago. The knee gave him problems if he walked for a "period of time or stand," but other than that, he could physically do whatever he wanted (Tr. 46). He claimed that he did not have any friends and did not engage in any social activities or attend church (Tr. 54-55, 58, 63), but he had a girlfriend (Tr. 63). The plaintiff testified that he takes Adderall for his ADHD and that it is effective only to the extent that it calms him down just a "tad" and keeps him less jittery and less frustrated (Tr. 57). He further testified that he thought that he could do a job that involved only some interactions with supervisors and co-workers and no interaction with

9

the public, but later stated he had been unsuccessful sustaining similar jobs in the past (Tr. 59-60).

In lieu of testimony at the hearing, the ALJ posed interrogatories to a vocational expert regarding the plaintiff's ability to perform work (Tr. 246-50). The ALJ asked the vocational expert to consider a hypothetical individual of the plaintiff's age, education, and work history, who was limited to unskilled work that did not require contact with the public and involved only minimal face-to-face contact with his co-workers and supervisors (Tr. 248). The vocational expert responded that such an individual could not perform the plaintiff's past work because that work involved coordination with others, but that such an individual could perform other unskilled jobs such as machine tender, inspector, and dishwasher (Tr. 249). In response to an additional interrogatory, the vocational expert also stated that a hypothetical individual who had "moderate" limitations in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration; interact appropriately with the general public; and to get along with co-workers or peers could not perform any of the above-mentioned jobs or other work in the national economy (Tr. 250).

Following the ALJ's decision, the plaintiff submitted additional evidence to the Appeals Council. The evidence consisted of an August 22, 2011, psychiatric evaluation by Dr. John Dewitt, M.D., at the request of the plaintiff's attorney (see Tr. 4, 526-31). Dr. Dewitt, after interviewing and examining the plaintiff, made the following assessment: rule out residual/adult ADD; rule out mood disorder; rule out atypical bipolar, post history of marijuana abuse and alcohol abuse; rule out antisocial personality disorder; GAF of 40. He prescribed Abilify 2 mg. Dr. Dewitt also completed a Mental Residual Functional Capacity ("RFC") Assessment where he opined "moderate" and "marked" limitations regarding the plaintiff's mental functioning. Dr. Dewitt found him "moderately limited" in: ability to understand and remember very short and simple instructions; ability to carry out very short

10

and simple instructions; ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; ability to sustain an ordinary routine without special supervision; ability to accept instructions and respond appropriately to criticism from supervisors; ability to maintain socially appropriate behavior; ability to respond appropriately to changes in the work setting; ability to be aware of normal hazards and take appropriate precautions; ability to travel in unfamiliar places or use public transportation; ability to set realistic goals or make plans independently of others. He found the plaintiff "markedly limited" in: ability to remember locations and work-like procedures; ability to understand and remember detailed instructions; ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; ability to work in coordination with or proximity to others without being distracted by them; ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (Tr . 526-31).  Dr. DeWitt also completed a form in which he opined that the plaintiff met the criteria of Listing 12.04 Affective Disorders (Tr. 532-45).

The Appeals Council thereafter issued a decision denying review and making the evidence from the plaintiff's examination by Dr. DeWitt a part of the record (Tr. 4).

## ANALYSIS

The plaintiff alleges disability commencing August 1, 2004, at which time he was 19 years old.  He was 27 years old a the time the ALJ hearing decision was issued. The ALJ found that the plaintiff's ADHD and depression were severe impairments.  The ALJ further determined that the plaintiff could perform a full range of work with a limitation to unskilled non-production type work with minimal contact with co-workers or the public.  The plaintiff argues that the ALJ erred in failing to weigh the limitations documented in the evaluations of examining psychologist Dr. Bradley and the state agency consultants.  He further argues that the ALJ erred in failing to properly address his mental impairments and

11

limitations in the hypothetical question to the vocational expert. Lastly, he contends that the Appeals Council "fail[ed] to explain why this evidence [regarding the plaintiff's examination by Dr. DeWitt] was not considered in affirming the decision of the ALJ" (pl. brief 11).

### Severe Impairments

At step two of the sequential evaluation process, the ALJ found that the evidence of record supported a finding that the plaintiff had "severe" impairments, ADHD and depression, that had more than a minimal effect on his ability to perform basic work activities (Tr. 28). *See* 20 C.F.R. § 404.1521(a) (defining non-severe impairments); *Evans v. Heckler*, 734 F.2d 1012, 1014 (4ᵗʰ Cir. 1984) (An impairment is considered non-severe "if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work . . . ."). The plaintiff argues that the ALJ erred at step two when he did not also find that his intermittent explosive disorder was a "severe" impairment (pl. brief 7). As argued by the Commissioner, whether the ALJ found that this impairment was severe or non-severe is not legally relevant because the combined effects of all impairments, both severe and non-severe, must be taken into consideration at subsequent steps of the sequential evaluation. *See* 20 C.F.R. § 404.1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' . . . when we assess your residual functional capacity." (internal citations omitted)). As a result, if an ALJ commits error at step two, it is rendered harmless so long as the ALJ properly concludes that the claimant cannot be denied benefits at step two, but rather continues to the next step of the sequential evaluation process. *See Carpenter v. Astrue*, 537 F.3d 1264, 1266 (10ᵗʰ Cir. 2008) (holding that any error at step two of the sequential evaluation process becomes harmless if the ALJ "reached the proper conclusion that [the claimant] could not be denied benefits at step two and proceeded to the next step of the evaluation sequence").

Here, the ALJ found the plaintiff had severe impairments and proceeded to the next step of the sequential evaluation process.  Accordingly, any allegation of error in this regard is without merit.

### RFC and Hypothetical

Between steps three and four of the sequential evaluation process, an ALJ must assess a claimant's RFC "based on all the relevant medical and other evidence." 20 C.F.R. §§ 404.1520(a)(4), 404.1545(a).  Here, the ALJ found that the plaintiff had the RFC to perform unskilled non-production type work with minimal contact with co-workers or the public (Tr. 29).  Based on interrogatories completed by a vocational expert, the ALJ went on to find at steps four and five of the sequential evaluation process that the plaintiff could not perform any of his past relevant work, but he could perform other unskilled work that existed in the national economy (Tr. 33-34).

The plaintiff challenges the ALJ's step five finding and reliance on the vocational expert's interrogatory responses that he could perform work in the national economy (pl. brief  8-10).  Specifically, the plaintiff argues that the ALJ erred at step five because he relied on the vocational expert's interrogatory response that did not include certain "moderate" limitations identified by the state agency physicians.

Two state agency psychologists who reviewed the plaintiff's medical records identified in Section I of the agency's mental RFC form that the plaintiff had some "moderate" limitations (including in his abilities to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; and interact with the general public or co-workers), but that he was otherwise "not significantly limited" (Tr. 321-23, Dr. Von's assessment; Tr. 360-62, Dr. Neboschick's assessment).  Both psychologists went on to opine in Section III of the same form that the plaintiff could understand and carry out short, simple job instructions for two hour periods and would be best suited for work that did not involve continuous interaction with the general public or

13

co-workers (Tr. 323, 362).  The ALJ gave both psychologists' assessments "significant weight" because the ALJ found that they were "not contradicted by other medical opinions of record, or by any fully credible testimony, and are thus consistent with the totality of the record" (Tr. 33).  The ALJ essentially adopted Dr. Von's and Dr. Neboschick's functional capacity assessments when he found that the plaintiff could perform unskilled, non-production type work that involved only minimal contact with co-workers or the public (Tr. 29).

The ALJ went on to ask a vocational expert, in the form of written interrogatories, about a hypothetical individual with the same RFC to perform work.  The vocational expert responded that such an individual could perform the jobs of machine tender, inspector, and dishwasher (Tr. 249).  When the ALJ asked in another interrogatory about such an individual that also had "moderate" limitations in the ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; and interact with the general public or co-workers – the exact limitations assessed by Dr. Neboschick[5] in Section I of the mental RFC form (Tr. 360-61) – the vocational expert responded that there were no jobs that such an individual could perform (Tr. 250).

The ALJ stated that he adopted the vocational expert's response that the plaintiff could perform the jobs of machine tender, inspector, and dishwasher (Tr. 34).  Thus, the ALJ implicitly rejected the vocational expert's response regarding the effect that the moderate limitations had on the hypothetical individual's ability to perform work.

The plaintiff contends that the ALJ committed reversible error in failing to acknowledge or address the moderate limitations and the vocational expert's response to the hypothetical including the moderate limitations (pl. brief 8-10).  However, as argued by

_____

[5]Dr. Von's assessment was slightly different in that she found the plaintiff's ability to maintain attention and concentration for extended periods was not significantly limited (Tr. 321).

the Commissioner, the plaintiff is mistaken regarding the purpose of the severity ratings provided by the state agency psychologists and the effect they had on the ALJ's RFC assessment.  The mental RFC form is a standard agency form.  The agency's Program Operations Manual System ("POMS"), section DI 24510.065.B.1, states that severity ratings, such as moderate limitations like those assessed by Dr. Von and Dr. Neboschick, do not describe function and do not usefully convey the extent of capacity limitations. POMS  DI  24510.065.B.1,https://secure.ssa.gov/apps10/poms.nsf/lnx/0424510065. Moreover, POMS section DI 24510.060 explains how the agency intends the form to be used. Section I of the form, the "summary conclusions," is "**merely a worksheet** to aid in deciding the presence and degree of functional limitations and the adequacy of documentation and **does not constitute the RFC assessment**." POMS DI 24510.060.B.2, https://secure.ssa.gov/apps10/poms.nsf/lnx/0424510060 (emphasis in original).

Section III of the form is where the state agency consultant records the actual mental RFC assessment. POMS DI 24510.060B.4.  In Section III, the medical consultant explains the Section I "summary conclusions" in terms of the extent to which mental capacities or functions could or could not be performed in work settings. POMS DI 24510.060.B.4, https://secure.ssa.gov/apps10/poms.nsf/lnx/0424510060. Here, in Section III, the functional capacity assessment section, the state agency psychologists (Dr. Von and Dr. Neboschick) generally agreed that the plaintiff could understand and carry out short, simple job instructions[6] for two hour periods and would be best suited for work that did not involve continuous interaction with the general public or co-workers (Tr. 323, 362).

In a similar case, *Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002), the Seventh Circuit Court of Appeals recognized that relying on the medical consultant's mental RFC assessment in Section III of the form was proper.  The medical consultant in that case

_____

[6]As argued by the Commissioner, this is consistent with unskilled work. *See* SSR 83-10, 1983 WL 31251, at *7 ("Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.").

found the claimant "moderately limited" in several areas, but "translated his worksheet observations into an assessment of [claimant's] mental residual functional capacity," concluding that he could perform repetitive, low-stress work. *Id*. at 285-86. The court found that substantial evidence supported the ALJ's mental RFC determination based on the medical consultant's ultimate conclusion that the claimant could perform repetitive, low stress work. *Id*. at 289. Likewise, in this district, the Honorable R. Bryan Harwell, United States District Judge, recently found that an ALJ's hypothetical, which included limitations to simple one, two-step tasks and avoiding contact with the public, sufficiently accounted for the claimant's limitations in concentration, persistence, and pace. *Sensing v. Astrue*, C.A. No. 6:10-cv-3084-RBH, 2012 WL 1016581, at *7 (D.S.C. March 26, 2012) (slip copy). Judge Harwell found that substantial evidence supported the ALJ's RFC finding and hypothetical, including evaluations finding that the claimant in that case, like the plaintiff here, was not significantly limited in understanding, remembering, and carrying out short, simple instructions. *Id.* The claimant's moderate limitations as found by the doctors in that case were very similar to the plaintiff's here. *Id.* (mental RFC assessment found claimant moderately limited in the ability to understand, remember, and carry out detailed instructions; interact appropriately with the public; and set realistic goals). *See also Lydia v. Astrue*, C.A. No. 2:11-1453-DCN-BHH, 2012 WL 3304107, at *6 (D.S.C. July 25, 2012) (finding hypothetical limiting claimant to "simple, one to two step tasks" sufficiently encompassed and was supported by medical opinions finding claimant moderately limited in her ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; and interact appropriately with the general public), *Report and Recommendation adopted by* 2012 WL 3308108 (D.S.C. Aug. 13, 2012).

Here, the state agency psychologists similarly noted in Section I that the plaintiff had moderate limitations in several areas (Tr. 321-22, 360-61). However, they

translated their summary conclusions into a specific RFC assessment that accounted for those moderate limitations (Tr. 323, 362). As in the cases cited above, the ALJ's RFC determination and hypothetical here were consistent with the psychologists' opinions as to the plaintiff's mental RFC assessment. Thus, contrary to the plaintiff's assertion, the ALJ had no obligation to specifically rely upon the moderate limitations in Section I of the forms completed by the state agency psychologists. Rather, the ALJ accepted these opinions and translated these moderate limitations into a mental RFC assessment and hypothetical that were an accurate and consistent portrayal of the plaintiff's ability to do unskilled work with limited contact with the public or co-workers. The ALJ's opinion is supported by substantial evidence, and this allegation of error is without merit.

The Commissioner concedes that the ALJ erred in even posing an interrogatory question to the vocational expert regarding a hypothetical individual who could perform unskilled non-production type work with minimal contact with the general public and co-workers and who had moderate limitations in five areas (Tr. 250). The ALJ should have never asked an additional hypothetical question that specifically included the moderate limitations, because the moderate limitations were already accounted for in the prior hypothetical question that contained the ALJ's RFC assessment, which, as described above, was based on the two psychologists' functional capacity assessments (Tr. 249-50). This court agrees with the Commissioner that the error was harmless as the moderate limitations were already accounted for in the ALJ's prior question, and, therefore, including them in an additional question was purely redundant. Further, the ALJ implicitly rejected the vocational expert's response to the erroneous question when the ALJ found that the plaintiff could perform work in the national economy (Tr. 34). *See Figgs v. Astrue*, No. 5:10-478-Oc-18TBS, 2011 WL 5357907, at *9 (M.D. Fla. Oct.19, 2011) (holding "there is sufficient medical evidence to support the ALJ's implicit finding that the plaintiff can perform 'simple routine, repetitive tasks' despite her moderate limitations in concentration,

17

persistence and pace") (citing *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)).  Accordingly, the error did not affect the ALJ's ultimate conclusion, which was based on the vocational expert's prior interrogatory response to a question that accounted for all of the plaintiff's credible impairments (Tr. 249), that the plaintiff could perform work that existed in the national economy (Tr. 34). *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (finding the ALJ's error harmless where the ALJ would have reached the same result notwithstanding).

### *Appeals Council Evidence*

The plaintiff also alleges error by the Appeals Council.  The administrative scheme for handling Social Security claims permits the claimant to offer evidence in support of the claim initially to the ALJ.  Once the ALJ renders a decision, the claimant is permitted to submit new and material evidence to the Appeals Council as part of the process for requesting review of an adverse ALJ decision. 20 C.F.R. § 404.968, 404.970(b).  This new evidence is then made part of the record.  The regulations, however, do not require the Appeals Council to expressly weigh the newly produced evidence and reconcile it with previously produced evidence before the ALJ. Instead, the Appeals Council is required only to make a decision on whether to review the case and, if it chooses not to grant a review, there is no express requirement that the Appeals Council articulate its rationale. *Meyer v. Astrue*, 662 F.3d 700, 705-06 (4th Cir.2011).  As the Fourth Circuit addressed in *Meyer*, the difficulty arises under this regulatory scheme on review by the courts where the newly produced evidence is made part of the record for purposes of substantial evidence review but the evidence has not been weighed by the fact finder or reconciled with other relevant evidence.  Under the particular facts presented in *Meyer*, the court determined that the new evidence in that case was not "one-sided" and that upon consideration of the record as a whole, the court could not determine whether substantial evidence supported the ALJ's denial of benefits. *Id*. at 707.  In *Meyer*, the ALJ determined that the record lacked certain

18

evidence the ALJ deemed critical; the plaintiff subsequently obtained this evidence and presented it to the Appeals Council. *Id*. On this record, the Fourth Circuit concluded that "no fact finder has made any findings as to the treating physician's opinion or attempted to reconcile that evidence with the conflicting and supporting evidence in the record." *Id*. Because "[a]ssessing the probative value of competing evidence is quintessentially the role of the fact finder," the case had to be remanded to the ALJ for further fact finding. *Id*.

Here, the plaintiff submitted additional evidence to the Appeals Council consisting of an evaluation by Dr. DeWitt and opinions completed by Dr. DeWitt one week after he first examined the plaintiff in which Dr. DeWitt opined that the plaintiff's mental impairments met Listing 12.04 and that the plaintiff was incapable of "adequately performing any type of vocation in any setting either full or part time" (Tr. 526-45).

The plaintiff argues that the Appeals Council "fail[ed] to explain why this evidence was not considered in affirming the decision of the ALJ" (pl. brief 11). However, the Appeals Council's notice makes clear that the Appeals Council did consider this evidence when it denied the plaintiff's request for review (Tr. 4 (listing Dr. DeWitt's evaluation and opinions as additional evidence it received and reviewed)). Moreover, the Appeals Council was not required to articulate a reason for declining the plaintiff's request for review. *See Meyer*, 662 F.3d at 705-706.

Furthermore, this court agrees with the Commissioner that the ALJ's decision is supported by substantial evidence even in light of the additional evidence submitted to the Appeals Council. As the ALJ correctly observed, medical and other evidence supported this finding and detracted from the plaintiff's allegations of disability. Dr. DeWitt performed an evaluation of the plaintiff on August 22, 2011, which was the first time that the record shows Dr. DeWitt ever saw the plaintiff (Tr. 526-28). Then, on August 29, 2011, with no evidence of any further contact with the plaintiff, Dr. DeWitt offered opinions on check-the-box style forms that mirrored (but were not) government forms. In these forms,

Dr. DeWitt opined that the plaintiff's mental impairments met the listings (and that the plaintiff was therefore disabled) (Tr. 532) and that the plaintiff was moderately to markedly limited in most areas of work-related functioning (Tr. 529-31). Dr. DeWitt concluded that the plaintiff had a "global impairment of mood, energy, cognition and clarity of thought that prevents him from adequately performing any type of vocation in any setting either full or part time" (Tr. 531).

Notably, Dr. DeWitt only evaluated the plaintiff once prior to offering his conclusory opinion. *See* 20 C.F.R. § 404.1527(c)(2) (stating an ALJ should consider whether a treating source has seen a claimant "a number of times and long enough to have obtained a longitudinal picture" of the claimant's impairment); *Gibson v. Heckler*, 779 F.2d 619, 623 (11th Cir.1986) (the rule giving great weight to physician's opinion does not apply where physician has only examined patient one time). Further, Dr. DeWitt's check-the-box opinion did not provide any supporting explanation for his conclusions. *See* 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion."). Moreover, as the ALJ noted in his decision (Tr. 32, authored prior to Dr. DeWitt's opinion), none of the plaintiff's treating (or examining or reviewing) physicians opined that the plaintiff was incapable of work. In fact, Mr. Douglas – who counseled the plaintiff in individual therapy over the course of two years – explicitly opined that he did not think the plaintiff met the requirements for disability (Tr. 30, *see* Tr. 513). Thus, Dr. DeWitt's opinion was entirely inconsistent with the longitudinal evidence. *See* 20 C.F.R. § 404.1527(c)(4) (stating an ALJ must consider whether an opinion is consistent with the record as a whole); *Davis v. Apfel*, No. 98-1145, 1998 WL 827322, at *3 (4th Cir. Dec. 1, 1998) (finding the ALJ properly discounted opinions of claimant's treating physicians because they were conclusory); *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) ("[I]f a

20

physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.").

Under these circumstances, Dr. DeWitt's opinion does not overcome the substantial evidence already supporting the ALJ's decision. The Appeals Council expressly considered the additional evidence, but reasonably declined review because the evidence did not provide a basis for changing the ALJ's decision as it remained supported by substantial evidence (Tr. 1-4). *See* 20 C.F.R. § 404.970(b) (stating the Appeals Council will review a case if it finds the ALJ's "action, findings, or conclusion is contrary to the weight of the evidence currently of record").

## **CONCLUSION AND RECOMMENDATION**

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald
United States Magistrate Judge

January 18, 2013
Greenville, South Carolina

21